IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLACK, CELLULAR PHONE WITH A BLACK CASE IDENTIFIED BY FOUR STICKERS: A CHIMPANZEE, A PAIR OF DICE, A SKULL WEARING A CROWN AND THE WORD YEET; IMEi UKNOWN, CURRENTLY LOCATED AT THE WEBB CITY, MISSOURI, POLICE DEPARTMENT. | Case No. 25-SW-2010DPR<br><br>(UNDER SEAL) |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Michael Larery, a Task Force Officer ("TFO") with the United States Drug Enforcement Administration ("DEA"), being duly sworn, do depose and state as follows:

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property-an electronic device, more fully described in Attachment A-which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a TFO with the DEA, assigned to the Springfield, Missouri, Resident Office ("SRO"). I have been a TFO with the DEA since September 2022. As such, I am an investigative and federal law enforcement officer of the United States of America, authorized to conduct investigations of, and to make arrests and seizures for, offenses enumerated in the Controlled Substances Act, Title 21, United States Code.

3. I have also been commissioned as a Webb City, Missouri, Police Officer since 1998. Since August 2016, I have been assigned to the Ozark Drug Enforcement Team ("ODET") as a

narcotics investigator. I have received specialized training relating to the manufacture, distribution, and possession with intent to distribute controlled substances. From my training and experience, I have extensive knowledge of complex illegal drug manufacturing and distribution operations.

4. The information contained in this affidavit is based upon my personal knowledge and investigation, as well as information provided to me by other law enforcement agents involved in the investigation of this case. This affidavit contains the facts necessary to establish probable cause to search the electronic device more fully described in Attachment A. Not all of the facts known to me about this investigation have been included.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is a described as a black, cellular telephone with a black case identified by four stickers. The stickers start in the upper right corner of the case with a picture of a Chimpanzee in a blazer and tie wearing glasses with the saying "18% YOU." Under the Chimpanzee sticker is a multi-colored sticker of the word "YEET." The third sticker is a pair of dice showing the roll of six (6) on both dice and then, overlapping the dice, is a fourth sticker of a skull in black and white wearing a gold-colored crown (the "DEVICE"). The IMEi for the DEVICE is unknown. The DEVICE is currently in the custody of the Webb City, Missouri, Police Department located at 211 W. Broadway Street, Webb City, Jasper County, Missouri, within the Western District of Missouri. In my training and experience, I know that the DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the DEVICE first came into the possession of the Webb City, Missouri, Police Department.

6. The applied-for warrant would authorize the forensic examination of the DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7. On December 8, 2024, Webb City Police Officer Johnathan Berg conducted a traffic stop on a black Ford F-150 at the intersection of Main and Galena in Webb City, Jasper County, Missouri, a location within the Western District of Missouri. The traffic stop was in reference to Officer Berg observing the brake lights on the F-150 were inoperable as the vehicle came to a full stop on Main at Daugherty, one block from where Officer Berg stopped the vehicle.

8. Officer Berg contacted the operator of the vehicle and identified him as Caleb Blaine STARK. Officer Berg informed STARK of the reason for the traffic stop and asked for his driver's license and insurance. Upon STARK's information being checked through the Missouri Uniform Law Enforcement System, Officer Berg discovered that STARK had been operating the vehicle with a suspended Missouri driver's license. Officer Berg requested a backup officer and took STARK into custody once Officer Malachi Hensley arrived.

9. STARK was placed in handcuffs and secured in the back prisoner transport seat of Officer Berg's vehicle. Officer Berg inquired with STARK if there was anything in the truck and requested consent to search the vehicle, at which point STARK replied, "we don't need to look in it." While in the back of Officer Berg's patrol vehicle, STARK observed Officer Hensley looking around his vehicle and became agitated, yelling and violently moving his body in a motion which made the patrol vehicle rock back and forth. Officer Berg inquired with STARK why he was upset, and STARK told Officer Berg that they just needed to get going and that he was taking up his time with a simple ticket.

10. Officer Berg requested a canine unit based on STARK's continued attempts to divert officers from the vehicle. Joplin, Missouri, Police Department K9 Officer Donahue arrived shortly thereafter to conduct an open-air sniff around the vehicle. Upon completion of the open-air sniff, K9 Officer Donahue informed Officer Berg that his K9 partner alerted to the front of the vehicle and the rear fender wells on both the driver and passenger side. A search of the vehicle commenced; however, Officer Berg noticed STARK continued to become agitated and disruptive. Officer Berg then transported STARK to the Webb City Police Department, where he was booked into the city jail for driving while suspended. Officer Hensley, K9 Officer Donahue, and Webb City Police Corporal Austin Fohey continued the search of the vehicle.

11. During the search of the vehicle, Corporal Fohey located a large amount of a crystalline-type substance, believed to be methamphetamine, in a lunch pail between the two front seats as well as some smaller baggies. A continued search of the vehicle by Officer Hensley revealed a cardboard box in the back of the truck which was wrapped in at-shirt and covered by vehicle parts. Inside the box, Officer Hensley discovered two plastic-wrapped bags with a crystalline-type substance believed to be methamphetamine inside of them. The three bags of crystalline-type substance were seized by Officer Berg and processed as evidence into the Webb City evidence system. While processing the items into evidence, Officer Berg field-tested the crystalline-type substance which showed positive for methamphetamine. There were three total bags of methamphetamine which had a combined weight of approximately six (6) pounds. Based on my training and experience, I know that the amount of methamphetamine seized from STARK is an amount consistent with distribution and not personal use.

12. During the traffic stop, Officer Berg observed STARK was using a cellular telephone (the DEVICE), which had a Global Positioning System ("GPS") application open with a

highlighted route mapped out on the screen. Officer Berg questioned STARK about the DEVICE and asked for consent to search the contents. STARK denied consent for law enforcement to look at the DEVICE. The DEVICE was seized by Officer Berg who noted that the DEVICE had apparently lost battery power and shut off during the traffic stop. STARK told Officer Berg that he was headed to his girlfriend's house before the stop.

13. On December 9, 2024, I met with STARK at the Webb City Police Department. I took STARK from the holding facility to the booking room at the police department which is audio and video recorded. I advised STARK of his *Miranda* warnings from an issued *Miranda* card. STARK agreed to speak with me by responding he would talk but would not say anything. I asked STARK where he acquired the suspected methamphetamine and where he was headed to when stopped by police. STARK would not answer the question. I then asked STARK about the DEVICE and the OPS mapping application which was observed by Officer Berg. STARK replied that he was headed to a girl's house that he did not know and was using the DEVICE to navigate to the female's house. STARK was unable to give details on the address or the female's name, claiming "I don't know who she is, she ain't got nothing to do with anything really, I don't think." STARK was also unable to give any details regarding where he was staying or where he was coming from prior to the stop, aside from saying "by Lamar." Lamar, Missouri, is more than 30 miles from Webb City, Missouri.

14. On December 9, 2024, I took the methamphetamine seized from STARK and processed it to be sent to the DEA Laboratory as witnessed by DEA Special Agent Joseph Jones. The suspected methamphetamine was tested utilizing the Tru Narc Analyzer which showed the substance to be methamphetamine. The methamphetamine was sealed in two evidence bags with a total combined weight being approximately 2.75 kilograms (2,750 grams).

15. Based upon the above facts, including STARK's inconsistent responses regarding the GPS mapping location on the DEVICE, as well as the fact that STARK was transporting a large amount of methamphetamine in an area he was not local to, I believe STARK was utilizing the DEVICE to further his drug trafficking activities and had programmed in his intended destination with the large amount of methamphetamine. As a result, I believe the DEVICE will contain evidence of violations of 21 U.S.C. §§ 846, 841(a)(l), and 843(b), that is possession with the intent to distribute controlled substances, distribution of controlled substances, conspiracy to distribute controlled substances, and unlawful use of a communications facility, including, but not limited to, information relating to the locations where he acquired/was transporting the methamphetamine.

## TECHNICAL TERMS

16. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Cellular or wireless telephone: a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other cellular telephones or traditional "landline" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the telephone. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include: storing names and telephone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information

6

on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such

7

navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of prec1s1on.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    g. Based upon my training, experience, and research, I know that the DEVICE, further described in Attachment A, has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

17. Based upon my training and experience, I know that drug couriers and traffickers commonly use multiple methods of communication to arrange transactions and conduct business. Cellular telephones, personal computers, and other devices are frequently used to send and receive coded messages over long distances.

18. Drug traffickers commonly maintain financial records reflecting accounting of monies collected and disbursed for the purchase and sale of controlled substance. These records have been discovered written on paper and recorded in digital files on computers, telephones, and other similar devices. Records also may include the transfer of monies involved in the sale and procurement of narcotics. Records may reflect the laundering or concealment of the profits from the sale of the narcotics, as proceeds from narcotics trafficking cannot be legally declared. In my experience, it is common for individuals engaged in illegal narcotics activities to utilize a telephone or computer to prepare and store documents relative to, and in connection with, their illegal activities. These records are typically stored on the devices' memory or on external memory devices.

19. Based upon my training and experience, I know that cellular or wireless telephones and their compatible hardware, in conjunction with computer software, are often utilized to store records

that include, but are not limited to, those relating to business activities, criminal activities, associates' names and addresses, and the identity and location of assets illegally gained through these criminal activities. These records are more fully described as information or data stored in the form of electronic or magnetic coding on cellular telephone and computer media or on media capable of being read by a computer or computer-related equipment. This media includes, but is not limited to, fixed hard drives and removable SIM cards, hard drive cartridges, laser disks, tapes, floppy diskettes, and any other media capable of storing magnetic coding.

20. Based on my training and experience, I know that electronic files can be received, stored, and easily moved from one cellular telephone or electronic storage medium to another. Therefore, electronic files downloaded to or created on one cellular telephone can be copied or transferred to any other cellular telephone, computer, or storage medium at the same location.

21. Based on my training and experience, I know that cellular telephones often contain information that will help identify sources of supply and the intended recipient of illegal drugs. I know that drug traffickers often refer to other co-conspirators by first name only or by nickname and store such information in the electronic memory of cellular phones. I know that retrieving names, phone numbers, and photographs assists in further identifying sources of supply and co-conspirators who would be difficult or nearly impossible to identify without direct knowledge of these individuals and their drug trafficking organization. I know that traffickers utilize mobile phones and digital cameras to photograph narcotics and proceeds from the sale of drugs. I know that drug traffickers photograph themselves with other co-conspirators and many times photograph themselves, and that these photographs can be transferred to computer memories.

22. Based on my training and experience, I know that once data is electronically encoded on a device, including cellular phones and computers, that the data will remain on the device indefinitely, even after it is deleted using standard methods in most circumstances. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the cellular telephone more fully described in Attachment A because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.

11

> Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.
>
> e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the DEVICE to human inspection in order to determine whether it is evidence described by the warrant.

25. In addition, based on my experience, I know that searching digitalized information for evidence of crime often requires the assistance of a qualified cellular phone or computer expert who can accurately retrieve the systems data in a laboratory or other controlled environment. This is true because of the following:

    a. Volume of evidence: Cellular phone storage devices such as SIM cards, hard disks, diskettes, tapes, and laser disks can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence by storing it in random order with deceptive type file names. This may require searching authorities to examine all of the stored data to determine which particular files is evidence or

instrumentalities of the crime. This sorting process can take weeks to months, depending on the volume of data stored.

b. Technical requirements: Searching cellular phone systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Because computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from the destructive code embedded in the system such as a "booby trap"), a controlled environment is essential to its complete and accurate analysis. The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but are not limited to, surveying various file "directories" and the individual files they contain (which is analogous to looking at the outside of a file cabinet for the pertinent files in order to locate the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

26. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

27. I respectfully request that a search warrant be issued authorizing the DEA, specifically the undersigned, or any other certified computer analysis forensic examiner, to conduct a thorough search of the contents of the DEVICE more fully described in Attachment A for the items listed in Attachment B, which are evidence of violations of 21 U.S.C. §§ 846, 841(a)(l), and 843(b), that is possession with the intent to distribute controlled substances, distribution of controlled substances, conspiracy to distribute controlled substances, and unlawful use of a communications facility.

28. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. Although STARK has been arrested, the investigation is still ongoing into his potential source of supply and other associates. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing

14

investigation and may severely jeopardize its effectiveness.

Further your affiant sayeth naught.

_____
Michael Larery
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed to before me in my presence via telephone on this 23rd day of January, 2025, in the Western District of Missouri.

_____
HONORABLE WILLIE J. EPPS, JR.
Chief United States Magistrate Judge
Western District of Missouri